**LIBERTY MUT. INS. CO. v. BOGGS et al.**

No. 1165.

Court of Civil Appeals of Texas. Eastland.

Oct. 27, 1933.

Rehearing Denied Dec. 8, 1933.

Leachman & Gardere, of Dallas, for appellant.

E. C. Gaines, of Austin, and J. A. Johnson, of Stephenville, for appellees.

FUNDERBURK, Justice.

From a judgment awarding recovery of workmen's compensation insurance in favor of Mrs. Travis G. Boggs and child, as beneficiaries of Travis G. Boggs, deceased, the insurance carrier, Liberty Mutual Insurance Company, has appealed.

In conformity to pleadings appropriately tendering issues as to whether Boggs was an employee, and as to whether he was an independent contractor, the court submitted said issues to the jury, whose verdict was that he was an employee and was not an independent contractor.

The first question presented for our determination is whether or not the evidence showed conclusively as a matter of law that Boggs was an independent contractor. Whether the relationship of Boggs to Curtis-Wright Flying Service was that of an employee, or was that of an independent contractor, must be determined from the provisions of the contract, if any, in virtue of which he had possession of, and was operating, the plane which crashed and killed him. The contract was not in writing. Evidence of its provisions consisted largely of the testimony of E. J. Bond, manager at the time of the accident of Curtis-Wright Flying Service, the alleged employer. Relevant portions of Bond's testimony were to the effect that Boggs was an air pilot, known by witness to be such since November, 1930; that in April, 1931, he did his first work for Curtis-Wright Flying Service, which was that of carrying up passengers on short trips, called "local hops;" that three kinds of flying service were done by Curtis-Wright Flying Service, namely, demonstrating aeroplanes, carrying passengers, and instructing student flyers; that for carrying passengers

Boggs was paid for the work he did at the rate of $5 per hour; that he made one flight to California to deliver an aeroplane; that this was done for a lump sum of $200, Boggs paying all expenses; that Boggs was paid $10 (and $6 expenses) to fly a plane to Bryan, Tex., to be left there; that, before the first work was done, Boggs made out a written application for employment; that the agreement under which Boggs took possession of the plane and flew to Stephenville on the occasion of the accident was that he was to take the plane out for the purpose of selling it to Miss Eunice Terry, who had previously talked to witness about buying a plane; that the plane was to be sold for a net minimum sum of $1,800 cash to the company, Boggs to pay all expenses whether a sale was made or not, and to have all over $1,800 for expenses and commission.

Other testimony of this witness, with the more important portions italicized, was as follows:

"Q. What instructions did you give him about how many flights he should make, or where he should go, or what he should do in regard to the operation on the trip? A. I did not instruct him regarding how much—how he should fly it, or how he should demonstrate, or where he was to go in order to sell it. He told me he was going to Stephenville.

"Q. You did not give him any instructions whatever? A. *I did as to the operations of the air-craft itself.*

"Q. In regard to what? A. The dual controls and the Department of Commerce rules.

"Q. He was familiar with those rules? A. Yes, sir.

"Q. As far as he had been—of the flights he was to make, or attempting to control his conduct in Stephenville, wherever he might go, you never attempted to control his actions in that particular? A. Not as far as method he was to use *so long as he did not violate any laws.*

"Q. Are the methods he used in flying an aeroplane—*the only instructions you gave to comply with the department regulation?* A. Yes, sir. * * * .

"Q. Was it or not any concern of yours as to what he did with the aeroplane here in Stephenville after he left your air port, eliminating violation of the Department of Commerce aeronautic? A. No.

"Q. Did you or not retain any control over his action as to what he should do on arrival in Stephenville? A. No, *I retained the control that the laws had over an aeroplane that Curtis-Wright owned.*

"Q. That was as far as the aeroplane was concerned. Did you reserve the right to dictate to him what he should do, or tell him what he should do, after he got here? A. None whatever, *with the exception of his com-*plying with the rules pertaining to the Department of Commerce that I discussed with him before he left.

"Q. As far as you were concerned, he could demonstrate to others and Miss Terry? A. Yes, sir.

"Q. Please state whether or not as far as the operation of the plane was concerned it was out of your hands, except for the violation of the Department of Commerce rules? A. *Travis was one hundred miles away from me with the aeroplane and I had no control of what he might do. It was physically impossible.* * * *

"Q. Was anything said about when he should come back, when he left? A. *I do not remember the exact discussion but he wasn't to stay out here longer than was necessary to determine whether or not he could make the sale. He wasn't to keep my aeroplane indefinitely.* * * *

"Q. *I will ask you if Travis had the right to carry passengers in that plane while he was here.* * * * A. *I expect he did.*

"Q. *Did you have the right or authority by reason of the contract and business relations with him—did you have the right and authority to direct him not to carry passengers on that trip?* A. Yes. * * *

"Q. *Did you do it?* A. *I did not outline to Travis what he was to do.* * * *

"Q. *You had the right on that trip to direct Travis not to carry passengers if you desired to do so?* A. *The subject did not come up.*

"Q. *You had the right to do it?* A. *I had the right to do anything with reference to that particular aeroplane.*

"Q. You did not give him those instructions, did you? A. No sir.

"Q. *Did you have the right after Travis came over here with that plane to direct him not to teach flying lessons to anybody?* A. Yes.

"Q. *Did you direct Travis not to teach flying lessons?* A. *I directed Travis specifically—I had quite a conversation—under no circumstances to permit anyone to ride in that plane when it had the dual controls.* * * *

"Q. * * * *Did you have the right to ask him not to teach flying lessons to any one on that trip?* A. Yes. * * *

"Q. * * * Did you specifically instruct Travis not to teach flying lessons to anyone on that trip? A. No. * * *

"Q. You had the right to do it, but you didn't do it? A. Yes, sir. * * *

"Q. You knew that he expected to undertake to sell that plane to Miss Eunice Terry over here? A. I did. * * *

"Q. You knew that she had a student's permit? A. Yes, sir. * * *

"Q. You knew that under what is under-

stood to be the rules of the Interstate Commerce Commission that Miss Terry then had perfect right—she had perfected the time for license—as a student in that respect, did you? A. Yes, sir.

"Q. Did you know whether was anything said about Travis taking up anybody else in that plane when he left? A. No, sir.

"Q. Did you know when he left whether he would or would not? A. I did not.

"Q. Had you instructed him not to take up anybody else? A. *I had instructed him to let no one ride in that aeroplane without a student's permit.*

"Q. Why had you instructed him to permit no one to ride in that plane * * * without a student's permit, unless you expected him to ride somebody else in that plane, besides Miss Terry, whom you knew had a student's permit? * * * A. For the same reason that I had been instructing all pilots that worked for me since I had undertaken—up until that date and ever since.

"Q. I do not believe you get my question, Mr. Bond. You have stated that you knew Miss Terry had a student's permit? A. Yes, sir.

"Q. And that she had a right to take flying lessons? A. Yes, sir.

"Q. As a student? A. Yes, sir.

"Q. Now, you wouldn't have given him any such instructions with reference to her would you? A. It was discussed that she was going to ride in the aeroplane, which was understood. * * *

"Q. You knew that she had a permit? A. Yes.

"Q. *Therefore, you did not instruct him not to take her up without removing the dual controls, did you?* A. *That's right.*

"Q. *You were expecting that he might take others than Miss Terry up for instruction?* * * * A. *I expected anything.* * * *

"Q. *Just state whether you did or did not expect that he do it.* A. *I did not know but what he might have, yes.* * * *.

"Q. *You consider that you had the right to tell Travis what he could do or went with the plane?* A. *Yes.*

"Q. *Did you consider that you had the right under your arrangement with him when he must bring the plane back?* A. Yes.

"Q. * * * *That you had the right to tell him what kind of flying service he might do while he was gone?* A. Yes, sir. * * *

"Q. Did he tell you whether or not he was going to do other work with that aeroplane? A. No, sir.

"Q. Did he agree or not that if he did do other work that the money would be given to Curtis-Wright Flying Service for that work done? A. We did not discuss it.

"Q. Did you know that he was going to do anything like that? A. I did not know what he was going to do.

"Q. As far as you were concerned he took the aeroplane for the purpose of a sale, and sale alone? A. Yes, sir, and *demonstration.* * * *

"Q. Mr. Bond, after Travis was killed that night, did you meet Mr. Boggs, his father, here in town? A. Yes, sir. * * *

"Q. I will ask you if you did not say to him * * * tell him that you sent Travis a telegram to bring the plane in, *but Travis was a privileged flyer and had the right to finish any unfinished work that he had at any place.* Did you tell his father that? A. I do not remember that conversation, no, sir. * * *

"Q. You do not deny it? A. *I don't deny it,* but I don't remember it. * * *

"Q. *You had the right as far as the Curtis-Wright Flying Service was concerned to order back the plane out of Dallas or Grand Prairie base?* A. *I did.*"

On the next day after Boggs went to Stephenville, Curtis-Wright Flying Service sent him a telegram reading: "Bring ship back today Stephenville unprofitable business." This order was disobeyed, but Boggs wired $30, which was delivered to Curtis-Wright Flying Service without explanation what it was for. It was shown by undisputed evidence that Boggs received money that day for flying lessons, and had previously given flying lessons to students and had taken up passengers at Stephenville and Dublin for compensation; that about two weeks previous to the accident he had taken up passengers and student flyers in the same aeroplane, belonging to Curtis-Wright Flying Service. W. W. Boggs, father of Travis Boggs, testified that the night after the accident Bond told him that Travis was a privileged flyer and was allowed to stay (after receipt of the telegram commanding him to return) and complete any unfinished work.

There are so many different definitions of "independent contractor," each well supported by high authorities, that we deem it unprofitable (it being unnecessary to do so) to attempt a selection of any particular definition for approval. There are a great many facts which have been held to be evidential, as tending to show that one is, or is not, an employee; or is, or is not, an independent contractor. It has sometimes been said that it is seldom, if ever, that any one of these facts is decisive of the question. Shannon v. Western Indemnity Co. (Tex. Com. App.) 257 S. W. 522.

■■ If it be admitted, or if the undisputed evidence shows conclusively that, at the time as to which the inquiry arises, one is performing services for another, there exists a presumption that his relation to the one for

whom he is performing the services is that of an employee. "There is a presumption," says the text of C. J., "that one performing work and labor for another is an employee of such other, and the burden is upon the latter who seeks to be relieved from the liability arising from such relationship to show the intervention of an independent contractor." 39 C. J. p. 52, § 28. In Taylor, B. & H. Ry. Co. v. Warner, 88 Tex. 642, 32 S. W. 868, 870, the Supreme Court said: "Every person who is found performing the work of another is presumed to be in the employment of the person whose work is being done, and if the facts be such as to exempt the owner of the property improved, or the person for whom the work is being performed, from liability for the acts of those performing such work, it devolves upon him who claims such exemption to make proof of the terms of the contract, showing that the relation of master and servant did not exist." See, also, 39 C. J. 970, § 1191; Burton v. Galveston, H. & S. A. Ry. Co., 61 Tex. 531; Texas & N. O. Ry. Co. v. Parsons, 102 Tex. 157, 113 S. W. 914, 132 Am. St. Rep. 857; King v. Brenham Automobile Co. (Tex. Civ. App.) 145 S. W. 278; Patton-Worsham Drug Co. v. Drennon (Tex. Civ. App.) 123 S. W. 705; Prairie Oil & Gas Co. v. Wright (Tex. Civ. App.) 238 S. W. 974; Beaumont, S. L. & W. R. Co. v. Olmstead, 56 Tex. Civ. App. 96, 120 S. W. 596; Kampmann v. Rothwell (Tex. Civ. App.) 107 S. W. 120; Oklahoma City Const. Co. v. Peppard, 43 Okl. 121, 140 P. 1084; Simila v. N. W. Imp. Co., 73 Wash. 285, 131 P. 831; Blashfield on Automobile Law, p. 1636, § 42; Rooks v. Swift & Co., 210 Ala. 364, 98 So. 16; Keen v. Army Cycle Mfg. Co., 124 S. C. 342, 117 S. E. 531; Midgette v. Branning Mfg. Co., 150 N. C. 333, 64 S. E. 5; Osteen v. Oil Co., 102 S. C. 146, 86 S. E. 202, L. R. A. 1916B, 629. This presumption, where it exists in full force (which, of course, can only be in the absence of evidence of any fact tending to rebut it), is sufficient to determine the issue. Such presumption necessarily includes, of course, the presumption of the existence of every evidential fact tending to show the relationship to be that of an employee, and the nonexistence of every fact tending to show the relationship to be that of an independent contractor.

■■■■ Notwithstanding intimations to the contrary, we are of the opinion that there is one evidential fact which, if admitted, or same is conclusively established by the evidence, is decisive of the issue of whether one performing a particular piece of work, or a definite service for another, is, or is not, an independent contractor. That is the fact of the right of control of the person in doing the work or performing the service. If the one for whom such work is being done, or service performed, does not by the contract relinquish such right of control by conferring it upon the person doing the work, or some one else, then the relation is that of employer and employee. If, however, the contract does confer such right exclusively upon the person doing the work or some one as to whom the latter occupies the status of employee or subcontractor, then he is an independent contractor, or the servant of, or subcontractor under, an independent contractor. It is believed that this proposition is amply supported by many authorities, of which may be mentioned the following: National Cash Register Co. v. Rider (Tex. Com. App.) 24 S.W.(2d) 28; Texas Emp. Ins. Ass'n v. Owen (Tex. Com. App.) 298 S. W. 542; McLeod v. Security Union Ins. Co. (Tex. Civ. App.) 22 S.W.(2d) 952; William Cameron & Co. v. Realmuto, 45 Tex. Civ. App. 305, 100 S. W. 194; Western Indemnity Co. v. Prater (Tex. Civ. App.) 213 S. W. 355; Texas & N. O. Ry. Co. v. Parsons (Tex. Civ. App.) 109 S. W. 240; Texas & N. O. Ry. Co. v. Parsons, 102 Tex. 157, 113 S. W. 914, 132 Am. St. Rep. 857. In the well-considered case of Shannon v. Western Indemnity Co. (Tex. Com. App.) 257 S. W. 522, 524, one of the cases suggesting that possibly no one fact is ever decisive, Judge German stated important conclusions as follows: "In spite of the many varied expressions contained in the decisions, and the reasons given for different conclusions, it may be safely said that in the last analysis all of the numerous evidential facts or elements with reference to any contract or agreement may be put into two general classes: (1) Those which have a direct bearing upon the question whether the person employed was free from or subject to the control of the employer with respect to the details of the stipulated work. (2) Those of a circumstantial description which possess a merely indirect or inferential significance with respect to that question." Only after reading a great number of decisions were we able to appreciate the full import of that statement. Of all the evidential facts, it recognizes two classes—those directly evidential, and those indirectly so. The great significance of the statement is that the fact of which they are evidential is the decisive fact of the right of control.

If conclusive proof of the right of control be decisive—a proposition which we take to be established—then it necessarily follows that, where the contract is in writing, and in evidence, or where, if not in writing, its provisions are admitted or established conclusively by the testimony, and where, in either such case, the contract, by express provision or necessary implication, shows who has the right of control, no question of fact arises. In such case all the usual evidential facts are wholly immaterial. The question will be determined as one of law from the provisions of the contract, but, where the evidence of the provisions of the contract is so uncertain or conflicting as to require resort to the proof of evidential facts in order to show who has the right of control, then whether or not such

ultimate issue is one of law or of fact will, of course, depend upon the nature and number of the evidential facts, and whether they are themselves established conclusively by the evidence, or are in dispute.

■■ We have already discussed the proposition with its supporting authorities that certain evidential facts when conclusively shown to exist give rise to presumptions which may wholly dispense with the necessity of proving other evidential facts. For further example, "the fact that one performs personal services for another, for an agreed compensation, carries with it *the presumption of the right of control* and discharge by the employer or beneficiary of the services." (Italics ours.) Texas & N. O. Ry. Co. v. Parsons (Tex. Civ. App.) 109 S. W. 240, 245, affirmed 102 Tex. 157, 113 S. W. 914, 132 Am. St. Rep. 857. That the right of one for whom another is doing work or performing services, to terminate the work or service, without regard to the final completion thereof, is a fact strongly evidential of the ultimate issue, has often been declared. 23 Tex. Jur. 556, § 13; J. W. Zempter Const. Co. v. Rodgers (Tex. Civ. App.) 45 S.W. (2d) 763; So. Surety Co. v. Shoemake (Tex. Civ. App.) 16 S.W.(2d) 950; Manning v. Beaumont, Sour Lake & Western Ry. Co., 107 Tex. 546, 181 S. W. 687; Millers' Mutual Casualty Co. v. Hoover (Tex. Com. App.) 235 S. W. 863; U. S. Fidelity & Guaranty Co. v. Lowry (Tex. Civ. App.) 231 S. W. 818; Steger v. Barrett, 58 Tex. Civ. App. 331, 124 S. W. 174; Burton v. Galveston, H. & S. A. Ry. Co., 61 Tex. 526; William Cameron & Co. v. Realmuto, 45 Tex. Civ. App. 305, 100 S. W. 194; Texas Emp. Ins. Ass'n v. Owen (Tex. Com. App.) 298 S. W. 542; So. Cotton-Oil Co. v. Wallace, 23 Tex. Civ. App. 12, 54 S. W. 638; 42 A. L. R. 616, note; 20 A. L. R. 761, note; 14 R. C. L. p. 72, § 9. Says the last-cited authority: "Indeed, it has been said that no single fact is more conclusive, perhaps, than the unrestricted right of the employer to end the particular service whenever he chooses without regard to the final result of the work itself.". It is difficult for us to see why such fact, if indisputably established, should not be entirely conclusive. It would seem that the power to control would be the equivalent of the right to control, and if so, the unrestricted power to stop the work or end the service, short of the completion thereof would seem to be conclusive of the right of control. It would also appear that the right or power to end the work or performance of service without regard to the completion thereof would be a direct denial of any right in the one doing the work or performing the service to complete it. Absence of the right to complete the work or performance of services on the part of the one doing same seems to us to show conclusively absence of the right of full control by such person (except as to the result) which is according to all authorities necessary to show the existence of an independent contractor. See 42 A. L. R. 616, note.

■ If the right of control be conclusively shown to exist, then evidence to show the actual exercise of control or the absence of it becomes, of course, wholly immaterial. It is the right of control, and not the fact of control, which is decisive. King v. Galloway (Tex. Com. App.) 284 S. W. 942; Lone Star Gas Co. v. Kelly (Tex. Com. App.) 46 S.W.(2d) 656; National Cash Register Co. v. Rider, supra; Prairie Oil & Gas Co. v. Wright, supra; King v. Brenham Automobile Co. (Tex. Civ. App.) 145 S. W. 278; Corrigan et al. v. Heubler (Tex. Civ. App.) 167 S. W. 159; Smith v. Humphreyville, 47 Tex. Civ. App. 140, 104 S. W. 495; 19 A. L. R. 240, note; Card Digest, Independent Contractor, No. 5.

■ Before passing to an application of the facts, there are two other principles to which it may be well to call attention. There is good authority for the proposition that the undertaking which constitutes one an independent contractor must be to do a specific piece or quantity of work. Texas Emp. Ins. Ass'n v. Owen (Tex. Com. App.) 298 S. W. 542; J. W. Zempter Const. Co. v. Rodgers (Tex. Civ. App.) 45 S.W.(2d) 763. It will be noticed that in the preceding discussion we have added "specific service." There is good authority to the effect that the "result" of the work to be performed means a *product*, and not a service. 23 Tex. Jur. p. 355, § 13; King v. Galloway (Tex. Com. App.) 284 S. W. 942; So. Surety Co. v. Shoemake (Tex. Civ. App.) 16 S.W.(2d) 950; U. S. Fidelity & Guaranty Co. v. Lowry (Tex. Civ. App.) 231 S. W. 818; Texas & N. O. Ry. Co. v. Parsons (Tex. Civ. App.) 109 S. W. 240; Smith v. Humphreyville, 47 Tex. Civ. App. 140, 104 S. W. 495; 16 Am. & Eng. Ency. of Law (2d Ed.) p. 187. See the leading case of Jensen v. Barbour, 15 Mont. 582, 39 P. 906.

We are unable, however, to reconcile quite a number of late Texas cases with such rule. For example, see So. Surety Co. v. Shoemake (Tex. Com. App.) 24 S.W.(2d) 7. Here clearly only the performance of service was involved. We shall not undertake to express an opinion as to the better rule further than to say, in line with the two cases first above cited under this head, that, if the performance of service is to be treated the same as the doing of a particular piece or quantity of work, and thus constitute the "result" as to which only the employer retains control, the same should be held to mean a definite service not terminable at the will of the person for whom it is performed short of the completion thereof, at least, unless the contract itself so provides.

■ Applying these principles, if we are to hold that the evidence showed conclusively as a matter of law that Boggs was an independent contractor, it must likewise so appear that Curtis-Wright Flying Service by its contract with Boggs relinquished its right to con-

trol him in the performance of his services in demonstrating the aeroplane and in any other work or service which he may have been authorized to do or perform in reference to the operation thereof. It was undisputed that the plane belonged to Curtis-Wright Flying Service and Boggs had possession of it for the purpose of selling it for said owner. Prima facie, therefore, Boggs was an employee and not an independent contractor. We think that, aside from the service in the performance of which it is insisted Boggs was an independent contractor, there was evidence raising an issue of fact as to whether or not he was an employee engaged in operating the plane to take up passengers and give lessons to student flyers. Curtis-Wright Flying Service was engaged in such business. Boggs had taken up passengers before at Curtis-Wright Flying Service's field and received pay therefor. From that fact it would be presumed, nothing to the contrary appearing, that he was at that time subject to the control of the owner, and therefore an employee. Texas & N. O. Ry. Co. v. Parsons, supra. He had taken up both passengers and student flyers at the place of the accident about two weeks previously in the same plane, belonging to Curtis-Wright Flying Service. Denial by the manager of knowledge of that fact is by no means conclusive. The manager gave him instructions just before leaving to allow no one to ride with the dual controls in place, thus implying authority to permit persons to ride with the dual controls removed. The instruction was evidentiary because of the very fact that it was given, and the further fact that the prospective purchaser was known to be a licensed flyer to whom the instruction was not applicable. The wording of the telegram, and the mere fact that it was sent, was of evidentiary value.

But, with reference to demonstrating the plane for the purpose of sale, and regarding that as the sole business for which the plane was placed in Boggs' possession, while that would perhaps present a serious question as to whether Boggs was in the course of his employment at the very time the plane crashed, the evidence on that phase of the case does not show conclusively, we think, that he was an independent contractor. Bond, the manager, testified that he, as representative of the owner of the plane, had the right to order Boggs to bring the plane back at any time. He attemped to exercise such right by sending the telegram commanding him to return it "today." If it can be said that he testified to a contract, the legal effect of which was to take away such right, it must be borne in mind that both phases of the testimony were by the same witness, and one part could not be given conclusive effect over another part. Testimony to the effect that the owner of the plane had no control was explained by other testimony to refer to the physical impossibility under the circumstances of enforcing control, not at all the same question as the *right* of control. The testimony regarding the provisions of the contract, if taken to be true, was not such as to show conclusively that the owner retained no right to control the operation of the plane and to order its return at will. The agreement testified to was not inconsistent with a mere option in Boggs to keep the plane and endeavor to sell it, only until called back, or, in other words at the will of the owner. We, therefore overrule the contention that the evidence conclusively showed as a matter of law that Boggs was independent contractor.

[redacted] The next question is: Did the trial court err in submitting the issue of independent contractor so as to require the jury to make their finding thereon according to "the preponderance of the evidence"? Appellee had the burden of proving by a preponderance of the evidence that Boggs was an employee. This burden could not be shifted to the appellant. Mexican Central Ry. Co. v. Lauricella, 87 Tex. 277, 28 S. W. 277, 47 Am. St. Rep. 103; Jester v. Steiner, 86 Tex. 415, 25 S. W. 411; Clark v. Hills, 67 Tex. 141, 2 S. W. 356; St. Louis, Arkansas & T. Ry. Co. v. Burns, 71 Tex. 479, 9 S. W. 467; Scott v. Pettigrew, 72 Tex. 321, 12 S. W. 161; St. Louis Southwestern Ry. Co. of Texas v. Parks, 97 Tex. 131, 76 S. W. 740. Appellant, in addition to a general denial, specially pleaded in defense that Boggs was an independent contractor. The real question then is whether or not, in submitting the issue in the form complained of, the burden of proof was shifted to appellant. According to the decision of the Supreme Court in Boswell v. Pannell, 107 Tex. 433, 180 S. W. 593, it was not. But according to the decisions in Colorado & Southern Ry. Co. v. Rowe (Tex. Com. App.) 238 S. W. 908; Rosenthal Dry Goods Co. v. Hillebrandt (Tex. Com. App.) 7 S.W. (2d) 521; Norwich Union Ins. Co. v. Chancellor (Tex. Com. App.) 5 S.W.(2d) 494; National Cash Register Co. v. Rider (Tex. Com. App.) 24 S.W.(2d) 28, and a number of other cases, it was shifted. According to Boswell v. Pannell, supra, had appellant elected to stand upon its general denial and to rebut evidence that Boggs was an employee, with evidence tending to show that he was an independent contractor, any instruction or issue requiring the jury to determine from a preponderance of the evidence whether Boggs was an independent contractor would have shifted the burden of proof, but, since appellant did not elect to stand upon its general denial, but affirmatively pleaded that Boggs was an independent contractor, appellant, according to that decision, thereby acquired the right to have a special and affirmative submission of that defensive issue, and the burden of proof was properly upon appellant, and the court did not err in requiring the

finding to be according to a "preponderance of the evidence." Although this decision has never been expressly overruled, nor even criticized so far as we have found, the other cases mentioned, some of them having express approval of the Supreme Court, are in direct conflict with it. As an intermediate court, we do not feel warranted in refusing to follow the later cases. (Parenthetically, in this connection, the writer desires to say that he has long deplored the decision in the Rowe Case, and the subsequent cases following it, as being illogical, unwarranted by the authorities cited in support thereof, and clearly wrong. The error therein has contributed enormously to the existing confusion in the law relative to special issues. They confuse issues made by the pleadings and issues arising upon merely evidentiary facts. They make of a purely evidentiary fact, neither alleged nor denied by any pleading, an issue required to be submitted to the jury in the face of the statute which plainly requires that only issues made by the pleadings and the evidence shall be submitted. They deny, or else necessarily qualify, and thereby provide an exception to, the rule that mere evidentiary facts shall not be submitted as issues. This brief and incomplete criticism is prompted by the fact that all the while the writer has been wholly unaware of the Boswell v. Pannell decision, which seems never to have been noticed in any of the cases in conflict with it. In the writer's view it is greatly desirable that that decision be redeclared to be a correct interpretation of the law.)

What we have said in discussing the first question above shows that in our opinion the evidence established as a matter of law that Boggs was an employee unless he was an independent contractor. In other words, the determination of the question of fact as to whether he was an independent contractor would determine as a matter of law that he was or was not an employee. Such being the case, there was, therefore, no real necessity to submit the issue of whether Boggs was an employee. If that issue had not been submitted, and the issue of independent contractor had been submitted as determinative of, and in lieu of, the issue of whether Boggs was an employee, then, under all authorities, the burden of proof was upon appellees to establish by a preponderance of the evidence that Boggs was not an independent contractor. The text and decisions from which we have hereinbefore quoted, which seem to say that under certain conditions the burden of proof would be upon the appellant to show that Boggs was an independent contractor, are to be construed as meaning, we think, that the burden exists to produce enough testimony of such fact to raise an issue; otherwise they would be in conflict with the decisions above cited, which hold there can be no shifting of the burden of

proof. It follows from what has been said that we must sustain the proposition that the court erred in misplacing the burden of proof.

We will but briefly notice the other questions raised. If, as we have held, there was sufficient evidence to raise an issue of fact as to whether Boggs was an employee, then there was ample evidence to show that at the time he was killed he was in the course of his employment. The undisputed evidence shows he was killed while in the act of giving a student flyer lessons in flying. If it were a part of Boggs' business as employee to give flying lessons, then the fact that he disobeyed instructions to return the plane at the time he was directed to do so did not remove him from the course of his employment. He violated no part of the instruction, except that part which required that the return of the plane be "today." In no proper sense can it be said that he was killed as the result of disregarding his instructions; but, even if that were the case, the violation of instructions does not necessarily remove an employee from the course of his employment. The authorities establish as correct, we think, the proposition that it is only when an employee in violating instructions thereby does an act which is itself outside the course of employment that the violation of instructions becomes material. 23 A. L. R. page 1161 note; 8 R. C. L. Supplement p. 6231, § 92a. It is probably true that only in cases where the course of employment is determinable only from, and is dependent upon, instructions, that the violation of instructions can have controlling effect. If giving flying lessons to students was in the course of Boggs' employment, then it was none the less so simply because he violated an instruction to return with the plane to the airport on the day previous.

Appellant also makes the contention that the purpose of Boggs' trip was one personal to him, and that in the furtherance thereof he procured possession of the aeroplane, having no real intention of making a sale thereof. Although appellant links this question with the one regarding the violation of instructions, it is not necessarily dependent upon it. However, if it be conceded that Boggs did make the trip for a personal purpose, that fact is not of controlling importance, since there was also evidence justifying the conclusion that he merely combined personal business with that of his employer. This point will be referred to later in this opinion. It is sufficient to say here that, since the evidence fully supports the view that such was the case, there still remained, as an issue for the jury, the issue of whether there was a total abandonment of the employee's course of employment, which was concluded by the finding that Boggs was in the course of his employment.

██ ██ One issue submitted to the jury called for a finding as to "what was the average weekly wages of Travis G. Boggs, as that term has been defined to you in this charge?" The definition referred to was a literal copy of that contained in R. S. 1925, art. 8309, § 1, first subds. 1, 2, 3, and 5. The assignment of error is that the court erred in instructing the jury that either or all of the three definitions could be considered by them in determining the average weekly wages of deceased. The court did not so instruct the jury. The case being one submitted on special issues, the court was under no duty to give instructions upon the law of the case, and it would have been error to do so. See authorities cited in Standard v. Texas Pacific Coal & Oil Co. (Tex. Civ. App.) 47 S.W.(2d) 443. If the term "average weekly wages" was properly used in the statement of the issue submitted, then, it being a legal term, it was the duty of the court to give a definition. There being a statutory definition, the court could properly give no other. The gist of the objection which appellant sought to make was one going to the manner of stating the issue and not to the definition. It is our view that the definition of legal terms when required to be given are not to be varied according to the state of the evidence in particular cases. Texas & P. Ry. Co. v. Phillips (Tex. Civ. App.) 56 S.W.(2d) 210.

██ There was error, we think, in permitting the mother of Travis G. Boggs to testify that about a month before the accident he told her he was only trying to sell a plane to Miss Eunice Terry. Like testimony of Travis G. Boggs' father may have been admissible as being but the answer to a question propounded by appellant's counsel, and, as pertaining to a transaction part of the evidence of which was brought out by appellant. The testimony as to Boggs' statement to his mother was hearsay, and had a bearing upon the issue of whether Boggs was an employee.

██ There is no doubt, we think, that the court erred in permitting appellees' counsel to have the witness Bond, former manager for Curtis-Wright Flying Service, and who had made a report of the accident to the Industrial Accident Board, identify his answers made to the questions in the report, and his signature thereto, and then ask him if the answers were true. One of them clearly implied that Boggs was an employee, a vital issue in the case. The law provides that such reports are not admissible against the parties making them. R. S. 1925, art. 8309, § 5; Georgia Casualty Co. v. Darnell (Tex. Civ. App.) 243 S. W. 579; Petroleum Casualty Co. v. Crowe (Tex. Civ. App.) 16 S.W.(2d) 917; Norwich Union Indemnity Co. v. Rollins (Tex. Civ. App.) 8 S.W.(2d) 699; Texas Emp. Ins. Ass'n v. Lynch (Tex. Civ. App.) 29 S.W.(2d) 899; Employers' Casualty Co. v. Watson (Tex. Civ. App.) 32 S.W.(2d) 927. We think the proceeding complained of was but doing, indirectly, that which the policy of the law plainly prohibits.

██ We are also of the opinion it was error for the court to admit in evidence the logbook of Travis G. Boggs. If it be granted that, as some of the testimony seemed to show, the United States Department of Commerce requires air pilots to keep such logbooks, we are not advised that they constitute public records to be admissible under that theory. The "shop book" exception to the rule against hearsay evidence, relied on by appellees to sustain the action of the court, seems to us to have no application. Were this the only error, we would not reverse the case because the logbook afforded no aid in determining the average weekly wages, it not showing he had done any of the flying as an employee, nor how much he received, if anything. We do not see how the evidence could have been prejudicial.

██ There was no error, we think, in refusing to permit the witness Bond to state his reason for sending the telegram. The reason stated in the telegram was that Stephenville business was unprofitable. Any other reason was unknown to Boggs, and would have been self-serving. It was immaterial, so far as we can see, to any issue to which the sending of the telegram related.

██ There was likewise no error, it seems to us, in the court's refusal to submit a requested special issue as to whether Travis G. Boggs was in Stephenville to see Miss Eunice Terry for reasons personal to him. The issue as stated erroneously assumed that Boggs could not have had the dual purpose of serving his employer and seeing Miss Terry. 39 C. J. 1297, § 1494. As said by Judge Williams in Galveston, H. & S. A. Ry. Co. v. Currie, 100 Tex. 136, 96 S. W. 1073, 1074, 10 L. R. A. (N. S.) 367: "It is in cases of the character supposed, where there has been a mingling of personal motive or purpose of the servant with the doing of his work for his employer, that much of the difficulty and conflict of opinion have arisen in determining whether or not the wrong committed should be ascribed to the master or be regarded as the personal tort of the servant alone. It is now settled, in this state at least, that the presence of such a motive or purpose in the servant's mind does not affect the master's liability, where that which the servant does is in the line of his duty, and in the prosecution of the master's work." The issue requested called for a finding upon an inconclusive evidentiary fact.

It is unnecessary to pass upon the other questions, as they should not arise upon another trial. Being of the opinion that the court erred in the several respects discussed, and that the judgment should be reversed and remanded, it is accordingly so ordered.

## On Rehearing.

Both parties have filed motions for rehearing, which, after due consideration, we have decided should be overruled.

█ In the original opinion we said, among other things, that, since a finding upon the question of fact as to whether Boggs was an independent contractor would determine as a matter of law the question of whether he was an employee under the Workmen's Compensation Law, "there was, therefore, no real necessity to submit the issue of whether Boggs was an employee." Upon appellee's suggestion that this statement is unfortunate and should be withdrawn, we have concluded to withdraw it. The evidence in a case may establish as a matter of law that one in possession of another's property and performing work or services for such other is an employee (and therefore, of course, not an independent contractor), though the evidence be wholly silent as to whether he is or is not an independent contractor. This results because of certain presumptions arising upon particular facts when undisputed. But, when there is some evidence raising a question of fact as to whether one is an independent contractor, it at the same time, if not conclusive, raises a question of fact as to whether he is an employee. Since under the decisions of which Colorado & So. Ry. Co. v. Rowe, supra, is typical, these questions of fact are each independent issues required to be submitted to the jury, it would be the duty of the court to submit both, and error in the failure to submit one over proper objection would not be rendered harmless by the verdict rendered upon the other.

█ Since writing the original opinion, we have had occasion to consider more thoroughly than we were called upon to do in the instant case the question of submitting an issue of average weekly wages, and the giving of a proper definition of that term. The case referred to is Traders' & General Ins. Co. v. Mrs. Grace Williams et al., 66 S.W.(2d) 780. According to that opinion, there was no error in the instant case as may seem to be implied from the opinion, in submitting as an issue a general inquiry as to what was the average weekly wages of the alleged employee.

In view of the particular objection made, we were not called upon in this case to pass upon the correctness of the definition given of average weekly wages. The opinion in the Williams Case, supra, will disclose that according to our view the definition given in this case was not correct to the extent that it included first subdivision 3 of R. S. 1925, art. 8309, § 1.

In accordance with the conclusion above stated, both motions for rehearing are overruled.

HICKMAN, Chief Justice.

I did not fully concur in the opinion in the Williams Case above referred to, on the question of the proper method of submitting to a jury the issue of "average weekly wages," and, while I concur in overruling the motion for rehearing in this case, I do not concur in that portion of the opinion on rehearing referred to and approving what was said on that question in the Williams Case.